******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE CASSANDRA C.*
(SC 19426)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 8—officially released January 8, 2015\*\**

*Michael S. Taylor*, assigned counsel, with whom was *James P. Sexton*, assigned counsel, for the appellant (respondent mother).

*Joshua Michtom*, assigned counsel, for the appellant (minor child).

*John E. Tucker*, assistant attorney general, with whom were *Rosemarie T. Webber*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Benjamin Zivyon* and *Michael Besso*, assistant attorneys general, for the appelllee (petitioner).

*Daniel J. Krisch*, *Sandra Staub* and *David McGuire* filed a brief for the American Civil Liberties Union Foundation of Connecticut as amicus curiae.

*Opinion*

ROGERS, C. J. This appeal raised the question of whether Connecticut should recognize as a matter of our common law the "mature minor" doctrine, which allows a sufficiently mature minor to consent to or to refuse medical treatment. The threshold issue that we must resolve, however, is whether the trial court properly determined that Cassandra C., the minor daughter of the respondent mother (mother), was not competent to make her own medical decisions at the time of the underlying events. After certain medical providers reported to the Department of Children and Families (department) that Cassandra and her mother,[1] were refusing to obtain appropriate medical treatment for Cassandra, who had been diagnosed with Hodgkin's lymphoma, the petitioner, the Commissioner of Children and Families (commissioner), filed a neglect petition seeking an order of temporary custody of Cassandra pursuant to General Statutes § 46b-129 (a) and (b). The trial court, *Westbrook, J.*, granted the order placing Cassandra in the temporary custody of the department and ordered that Cassandra be removed from the residence where she lived with her mother and be placed in her cousin's home. After conducting an evidentiary hearing, the trial court, *Taylor, J.*, sustained the order of temporary custody and ordered that Cassandra be placed back in her own home on the condition the respondents allow the department to have unfettered access to Cassandra and that the respondents cooperate with her medical care providers. Cassandra subsequently started chemotherapy, but ran away from home before the treatment could be completed. The commissioner then filed a motion to reargue, for reconsideration, for clarification and to reopen the evidence "in order to consider evidence regarding [Cassandra's] subsequent behaviors and whether she is competent to make life/death decisions regarding her medical care." That motion was granted and an evidentiary hearing was held before the trial court, *Quinn, J.* At the conclusion of the hearing, Judge Quinn ordered that Cassandra remain in the custody and care of the department and that she be removed from her home, and authorized the department to make all medical decisions for her. Thereafter, the respondents filed this appeal[2] claiming that Judge Quinn improperly had found that Cassandra was not competent to make her own medical decisions and had violated the respondents' constitutional due process right to bodily and family integrity. After hearing oral argument on an expedited basis, this court affirmed Judge Quinn's judgment from the bench and indicated that a written decision would be issued in due course. This is that written decision.

In sum, we conclude that the question of Cassandra's competence to make medical decisions was squarely before Judge Quinn and that her finding that Cassandra

was not a mature minor was not clearly erroneous. We further conclude that, because the evidence does not support a finding that Cassandra was a mature minor under any standard, this is not a proper case in which to decide whether to adopt the mature minor doctrine. Finally, because the respondents have not established the factual predicate for their due process claims—that they were deprived of a hearing at which to determine Cassandra's competence to refuse medical treatment—we reject that claim.

The record reveals the following facts on which Judge Quinn reasonably could have relied in determining that Cassandra was not competent to make her own medical decisions and procedural history. Cassandra was born on September 30, 1997. From May, 2014 through July, 2014, when Cassandra was sixteen years old, she suffered from stomachaches, lower back pain, chest pain and an enlarged and tender cervical gland. When antibiotic treatment failed to resolve her condition, her primary care physician, Hemant K. Panchal, referred Cassandra to another physician, Henry M. Feder, an infectious disease specialist. After an initial appointment on July 1, 2014, Feder attempted to follow up with the respondents to determine whether the treatment he had prescribed was effective, but Cassandra missed two scheduled appointments. Feder finally saw Cassandra in early August, at which time he ordered a chest X ray that revealed enlarged lymph nodes. At that point, Feder suspected that Cassandra might have cancer and he scheduled an appointment for a needle biopsy of her enlarged cervical gland. Cassandra did not attend the appointment, which concerned Feder. Feder scheduled a second appointment at which a needle biopsy was taken that was suspicious for lymphoma.

At that point, Cassandra was referred to the cancer and blood disorders services division of hematology and oncology at the Connecticut Children's Medical Center (medical center) in Hartford. An appointment was scheduled for September 4, 2014, but Cassandra did not show up. Another appointment was scheduled for September 9, at which Cassandra was examined by Eileen Gillan, a physician with the Connecticut Children's Specialty Group, who recommended that Cassandra undergo a biopsy procedure of an enlarged lymph node. On September 12, 2014, Brendan Campbell, a surgeon, performed an incisional biopsy on Cassandra's enlarged cervical gland. Pathological tests showed conclusively that Cassandra was suffering from Hodgkin's lymphoma, a type of cancer that is invariably fatal if not treated, but that has a high probability of cure if treated in a timely manner. Interrupting chemotherapy treatment of the disease can lead to resistance of the cancer to treatment. Delaying chemotherapy treatment may increase the risk of a poor outcome and may require radiation treatment, which has increased risks of harmful side effects, especially for young women.[3]

On September 19, 2014, Gillan spoke by telephone with Cassandra's mother and informed her of the diagnosis. The mother was upset that Gillan had not called her earlier and by what she perceived as Gillan's attitude when she "nonchalantly" stated that she had been unsure how to break the bad news regarding Cassandra's diagnosis to the respondents. Gillan recommended that Cassandra undergo further evaluations to determine the stage of the cancer and to discuss treatment, but the mother refused.

At some point, Gillan asked her partner, Michael Isakoff, a pediatric oncologist, to take over Cassandra's treatment. Gillan told Isakoff that, on the basis of her interactions with the mother, she believed that Isakoff would be able to deal more effectively with her. Gillan also told Isakoff that the mother had been angry and hostile toward her and that the respondents were not interested in getting treatment or tests to determine the stage of the disease. Isakoff was able to schedule an appointment with the respondents to discuss these issues for October 7, 2014, but only Cassandra's mother and uncle attended that appointment. The mother was upset because she had been expecting to meet with Gillan. Isakoff explained the further testing and treatment that he recommended. When the mother expressed great concern about giving Cassandra "poisons," Isakoff acknowledged that the treatment had some toxic side effects, but explained that chemotherapy was the only way to treat the disease and that there were ways to reduce the toxicity. The mother also complained about the manner in which information had been relayed to her and other "process" issues, and was angry and hostile toward Isakoff. She further indicated that she did not believe the diagnosis and asked about getting a second opinion. Specifically, she questioned why the biopsy report showed no signs of the Epstein-Barr virus when, based on her research, that virus is always present with Hodgkin's lymphoma. Isakoff repeatedly assured the mother that that was not the case, but Isakoff was not convinced that she was comfortable with his response. Toward the end of the conversation, Isakoff told the mother bluntly that he was very concerned about the amount of time that had elapsed since the biopsy and that it was important for Cassandra to start treatment within two weeks. He asked the mother to contact him within two days to let him know how she wanted to proceed. At that point, the mother got up and walked out. On October 17, 2014, Isakoff wrote a letter to Cassandra's mother to express his concerns about the ongoing delays in the evaluation and treatment of Cassandra's disease and asked her to contact his office as soon as possible.

The respondents sought a second opinion about Cassandra's diagnosis from Matthew Richardson, a pediatric oncologist at Baystate Medical Center in Springfield,

Massachusetts. Richardson examined Cassandra on October 14, 2014, and, after reviewing the scans and pathology reports from the medical center, agreed with the diagnosis that Cassandra had Hodgkin's lymphoma. Richardson attempted to contact the respondents seven times over two days and left telephone messages regarding his diagnosis and the urgency of the situation. The mother finally returned his calls on October 20, 2014, and Richardson told her that it was urgent that the staging of Cassandra's cancer be completed and that treatment be started. The mother indicated that she had not yet decided whether Richardson would be Cassandra's treating physician. Two days later, the mother called Richardson and indicated that she wanted Richardson to treat Cassandra.

On October 23, 2014, a PET scan was performed that revealed extensive stage three lymphoma in Cassandra's neck, chest and abdomen. That same day, Richardson telephoned the mother and left a message on her telephone indicating that it was necessary to complete the staging evaluation and to start treatment, and that he was concerned that the period that had elapsed since the biopsy was beginning to be outside the standard of care. Richardson ultimately attempted to telephone the mother six times between October 25 and October 27, 2014, but received no answer. The mother finally telephoned Richardson on October 30, 2014, and stated that she had decided Cassandra would be receiving care from another physician. When Richardson asked where he should send Cassandra's medical records, the mother stated that she would pick them up. She also indicated that she did not have time to discuss the results of the PET scan and that Cassandra would not be following through with the pretreatment tests that had been scheduled.

Richardson spoke with Isakoff at some point and indicated that he had concerns about the mother's hostility and unwillingness to obtain treatment for Cassandra in a timely manner. In addition, Richardson told Isakoff that the respondents were seeking to have a second biopsy performed. Isakoff believed that a second biopsy was medically inappropriate because, even if it was negative, it would not invalidate the results of the first biopsy, and the biopsy procedure involves risk.

Meanwhile, on October 2, 2014, Feder had reported his concerns about the respondents' apparent unwillingness to obtain treatment for Cassandra's disease to the department. At that point, Margaret Nardelli, an investigator for the department, contacted the mother to discuss the referral. The mother indicated that she was not willing to meet with the department and that she was meeting Cassandra's needs. She also stated that she was obtaining a second opinion about Cassandra's condition. When Nardelli tried to follow up, the mother did not return her telephone calls. Finally, on October

21, 2014, Nardelli left a note at the respondents' residence. At that point, the mother called Nardelli. She was very upset and was yelling and swearing. The mother told Nardelli that she was not allowed to go to her home ever again, that Cassandra's needs were being met, and that she did not have to tell Nardelli anything or do anything that the department requested. The mother also told Nardelli that Cassandra felt fine and that she, the mother, did not think that Cassandra had cancer. Nardelli responded that if the mother did not want to meet with the department, Nardelli would speak with an attorney for the department about ways to ensure that Cassandra's needs were being met. The mother said that she did not care what the department did and hung up the telephone.

During Nardelli's investigation of the case, Richardson called her and indicated that he was concerned that the respondents were not moving quickly enough to obtain treatment for Cassandra's disease and that they were consistently not keeping medical appointments. Panchal also called Nardelli and stated that the respondents were not keeping scheduled appointments. In addition, Panchal reported that the mother had told him that he would no longer be Cassandra's physician and had demanded her medical records.

On the basis of this information, the department became concerned that the mother was not following through in a timely manner to obtain treatment for Cassandra's life threatening illness. The department also became concerned about the mother's "anxiety" and that the mother did not always remember information that previously had been provided to her. Although the mother eventually attended scheduled meetings with the department, she continued to question Cassandra's diagnosis and to demand further assessments that Cassandra's medical providers had found to be inappropriate. On the basis of these concerns, the commissioner filed a neglect petition alleging that the mother had "failed to meet the medical needs" of Cassandra and sought an ex parte order of temporary custody pursuant to § 46b-129 (b). The trial court, *Westbrook, J.*, found that there was reason to believe that Cassandra was in immediate physical danger and granted an ex parte order of temporary custody on October 31, 2014. Immediately thereafter, the department brought Cassandra to the emergency room at the medical center for an evaluation. At that time, Cassandra was "very fearful" of staying in the hospital and of waking up with "tubes sticking out of her." She also expressed concerns about not wanting to anger her mother, who, she said, was very distrustful of physicians. Pursuant to Judge Westbrook's order, Cassandra was removed from her home and placed in the home of a cousin pending a hearing.

A preliminary hearing on the commissioner's request

for an order of temporary custody was held on November 6, 2014, at which time Judge Westbrook ordered a guardian ad litem for Cassandra and scheduled an evidentiary hearing for November 12. At that evidentiary hearing, which took place before Judge Taylor, Nardelli, Feder, Campbell and Isakoff testified as to the foregoing facts. Cassandra's guardian ad litem, Jon David Anthony Reducha, testified that Cassandra had told him the previous day that she was willing to be treated for her disease, but that she would refuse treatment if she were not allowed to go home. Reducha acknowledged that Cassandra's decision to refuse treatment for her life threatening disease if she were not allowed to go home was not a rational decision. It was Reducha's understanding that Cassandra initially had resisted treatment because she was doing her own research and she needed time to absorb the information. Reducha believed that it would be in Cassandra's best interest to be allowed to go home so that she would agree to treatment.

Cassandra also testified at the November 12, 2014 hearing. Before she testified, her attorney requested the court's permission for her to testify from where she was sitting in the courtroom instead of from the witness stand, because she was nervous. When the trial court denied the request, the attorney requested permission to stand close to Cassandra "to give her a little comfort and moral support." The court also denied that request. Cassandra testified that her mother had told her many times that she did not want to lose a child and that she wanted her to undergo chemotherapy. Cassandra initially did not want to undergo chemotherapy because of "everything that happens when you go through chemo." After her best friend told Cassandra that she did not want to lose her and would "drag [her] to the hospital and make [her] do it," however, Cassandra changed her mind. Because the treatment was going to be very difficult, Cassandra wanted to be at home while she was undergoing chemotherapy. If she were not allowed to go home, she would refuse treatment. When told that the department was concerned that, if she were allowed to go home, she would still refuse treatment, Cassandra stated that "[i]f you let me go home today, I would start chemo tomorrow."

Cassandra's mother testified at the hearing that she had wanted to obtain a second opinion about Cassandra's condition because she had "a right to a second opinion" and the first diagnosis was serious. When the respondents went to Richardson, the mother asked him not to contact Isakoff because she wanted a "second opinion, not a second agreement . . . ." She was upset when she found out that Richardson had spoken to Isakoff. After she discontinued Cassandra's treatment with Isakoff, the mother decided not to comply with the department's request to "keep in touch" because she "was doing what [she] was supposed to be doing."

The mother testified that, although she continued to believe that she had a right to a second and even a third opinion about Cassandra's diagnosis, she believed that Cassandra had cancer and that she would die without treatment. She further testified that she "[a]bsolutely" agreed that Cassandra should be treated as soon as possible.

On November 14, 2014, Judge Taylor issued an order sustaining Judge Westbrook's order of temporary custody. The court ordered that Cassandra be placed back in her home with her mother subject to certain conditions, including that the mother allow the department unfettered access to Cassandra and her home, that she cooperate with Cassandra's medical providers and that she keep all medical appointments and appointments with the department. The court also ordered that Isakoff would serve as Cassandra's treating physician and that treatment was required to begin within seventy-two hours after Cassandra returned home. In addition, the court ordered that Cassandra remain within the state for the duration of this case and that she not leave her home for more than twelve hours without the prior authorization of the department or the court.

On November 17 and 18, 2014, Cassandra underwent her first two chemotherapy treatments. Her mother did not attend the second treatment. After the second treatment, Isakoff observed bruising around the site of the intravenous infusion. At that point, he told Cassandra that, because her veins were fragile, she would have to have a "port-a-cath"[4] surgically placed. Isakoff arranged for a surgeon to perform the procedure the next morning so that Cassandra could receive her scheduled treatment later that day. When a department employee arrived at the respondents' home on the morning of November 19, 2014, to transport Cassandra to her third chemotherapy treatment, Cassandra was not there. Her mother indicated that she did not know Cassandra's whereabouts. She made no efforts to find Cassandra and did not notify the police. The mother told the department that Cassandra would not be coming home. During the next several days, the department went to the respondents' home on a daily basis to search for Cassandra, and also went to the home of one of Cassandra's friends and to her workplace. The department also issued a "silver alert"[5] and searched online social media in an attempt to locate Cassandra. Several days after she disappeared, Cassandra's attorney called the department and stated that she wanted to return home.

Cassandra returned to her home on November 24, 2014, and, the next day, the department brought her to the medical center for an evaluation by Isakoff. Nardelli and two other department employees attended the meeting. Cassandra told Isakoff that she was adamant that she would not return for further chemotherapy. She stated that she did not feel sick and that when she

started to feel sick she might reconsider her decision, but that she would not be treated at the medical center because she did not trust the physicians there. Isakoff told Cassandra that there was a danger that the cancer would become resistant if she interrupted the chemotherapy treatment. Cassandra then told Isakoff that she had never intended to start chemotherapy and that she had stated that she would do so in order to get the department and the court to agree to allow her to go home. She also stated that she was going to be eighteen years old soon, at which point she would not be in the position of being forced into treatment.

On December 1, 2014, the commissioner filed in the trial court a motion for reargument and reconsideration, for clarification and to reopen evidence. The commissioner requested that the trial court conduct a hearing "to consider evidence regarding [Cassandra's] subsequent behaviors and whether she is competent to make life/death decisions regarding her medical care." An evidentiary hearing for that purpose was held before Judge Quinn on December 9, 2014.[6] Isakoff testified at the hearing that he did not believe that Cassandra was competent to make the decision to refuse chemotherapy treatment for her disease. Indeed, he testified that, if an adult were to make that decision, it would lead him to question that person's competence. Isakoff believed that it was unreasonable for Cassandra to subject herself to chemotherapy in order to be allowed to return home, especially if she intended to worsen her own prognosis by interrupting the treatment, but to refuse further chemotherapy to cure her fatal disease. He further testified that if Cassandra did not start chemotherapy within two weeks of the hearing, there would be a much higher probability that Cassandra would have to undergo radiation therapy. Isakoff also did not believe that Cassandra's mother was competent to make decisions regarding Cassandra's medical care. Although he understood the mother's concerns about putting "poisons" in Cassandra's body, the chemotherapy treatment provided Cassandra with her only chance of survival. Isakoff further testified that the mother's doubts about the diagnosis also were unreasonable, as the diagnosis had been repeatedly confirmed.

Cassandra's mother testified that she believed that Cassandra had cancer, that she believed that Cassandra needed chemotherapy, that she wanted Cassandra to have chemotherapy and that she had told Cassandra to undergo chemotherapy. She also testified, however, that she believed that it was Cassandra's "right as a human being" to refuse treatment and "to choose if she wants poisons that are going to affect her the rest of her life . . . ." When asked whether she knew that Cassandra would die without treatment, the mother stated, "[t]hat's what they say, but there's no guarantee with treatment of cancer . . . ."

At the conclusion of the hearing, Judge Quinn found that Cassandra's mother did not believe that Cassandra had Hodgkin's lymphoma or that she needed chemotherapy in order to have a chance to survive. Judge Quinn ordered that Cassandra remain in the custody of the department, that she be removed from her home and that the department make medical treatment decisions for her.

On December 17, 2014, the respondents filed in this court a joint motion for the emergency exercise of the court's supervisory power over the trial court. The respondents represented in their motion that Cassandra had been transferred to the medical center on December 9, 2014, and had not been permitted to leave since that time. They further represented that they had been informed that, on December 18, 2014, Cassandra's treatment would begin with the surgical placement of the port-a-cath and that chemotherapy would immediately follow. The respondents indicated that they had petitioned the trial court for an injunction against the treatment until they could file in this court an application to file an expedited appeal from Judge Quinn's December 9 ruling pursuant to General Statutes § 52-265a, and that Judge Taylor had denied the petition. They contended that Cassandra had a right to refuse treatment under the mature minor doctrine and requested that this court enjoin the treatment until further order of this court. This court treated the respondents' motion as a motion for review of a denial of an emergency motion for a stay and, after the commissioner filed an expedited response to the motion pursuant to this court's order, denied the motion. The respondents then filed an application for certification to appeal to this court from both Judge Taylor's November 14, 2014 ruling and from Judge Quinn's December 9, 2014 ruling, pursuant to § 52-265a. They also filed an appeal in the Appellate Court. The Chief Justice denied the respondents' application pursuant to § 52-265a, but we ordered that the respondents' appeal to the Appellate Court be transferred to this court and that it be heard on an expedited basis.[7]

Thereafter, the commissioner filed a motion for an expedited articulation in which it requested that Judge Quinn articulate the basis for her December 9, 2014 ruling. Specifically, the commissioner requested that Judge Quinn specify: "(a) [t]he extent to which the trial court credited the testimony of . . . Isakoff in which [he] indicated that Cassandra did not have the capacity to make sound medical decisions concerning her cancer treatment, and (b) [t]o the extent that [Cassandra] and [her] mother have raised the 'mature minor doctrine' on appeal, whether the trial court made a finding that the minor child was a mature minor." Judge Quinn issued an articulation in which she stated in response to part (a) of the request that she had credited Isakoff's

testimony that Cassandra did not have the capacity to make sound medical decisions concerning her cancer treatment based on "[Cassandra's] apparent willingness to undergo treatment [during the November 12, 2014 hearing before Judge Taylor] while secretly knowing she would not, the consequences of such behavior on the efficacy of the future treatment, and the totality of all the facts she knew . . . ." Judge Quinn also stated that she had observed Cassandra's behavior at trial and "saw how closely she followed her mother's testimony and hung on her every word." Judge Quinn then observed that the mother "did not appear to be in support of the chemotherapy and that Cassandra is concerned about going against what her mother would like to see happen." She further observed that "[t]he record is replete with [the] mother's arguments with physicians about the diagnosis, her seeking three separate opinions about the diagnosis, attempting to change pediatricians and delaying follow-up appointments and needed treatment." Judge Quinn concluded that the "mother has engaged in a passive refusal to follow reasonable medical advice for her mortally ill child." She further concluded that Cassandra "does not possess the necessary level of maturity or independence to make life and death decisions about her own medical care, as demonstrated both by her conduct and her behavior subsequent to the initial court order," and that Cassandra was "overshadowed by the strong negative opinions her mother holds about her cancer diagnosis and treatment, including chemotherapy." In response to part (b) of the requested articulation, Judge Quinn stated that Isakoff's "thoughtful assessment of [Cassandra's] capacity, the court's own observations of the parties and the witnesses, the observations of the [department's] investigations worker, and Cassandra's own actions all support the conclusion that she is an immature seventeen year old." Accordingly, she concluded that "Cassandra is not a mature minor. She is as yet incapable of acting independently concerning her own life threatening medical condition. And time is running out for the recommended course of treatment to have a positive outcome for her future."[8]

The respondents contend on appeal that this court should adopt the mature minor doctrine, under which a sufficiently mature minor may be deemed competent to make important medical decisions on his or her own. They further contend that Judge Quinn's finding that Cassandra was not a mature minor and competent to make her own medical decisions was not supported by any evidence because that issue was not before the court at the December 9, 2014 hearing. Finally, they contend that removing Cassandra from her home and subjecting her to treatment against her will without a hearing to determine whether she was mature enough to make medical decisions for herself violated her liberty interest in bodily integrity under the due process provi-

sions of the fifth amendment to the United States constitution and article first, §§ 8, 9 and 10, of the Connecticut constitution, violated the respondents' fundamental right to family integrity, and deprived the mother of her constitutionally protected interest in the care, custody and control of Cassandra.[9] We conclude that the question of Cassandra's competence to make medical decisions was squarely before Judge Quinn and that her finding that Cassandra was not a mature minor was not clearly erroneous. We further conclude that, because the evidence does not support a finding that Cassandra was a mature minor under any standard, this is not a proper case in which to decide whether to adopt the mature minor doctrine. Finally, because the respondents have not established the factual predicate for their due process claim—that they were deprived of a hearing at which to determine Cassandra's competence to refuse medical treatment—we reject that claim.

We begin our analysis by setting forth the standard of review. Whether Cassandra is a mature minor and, as such, competent to make her own medical decisions is a question of fact. *Belcher* v. *Charleston Area Medical Center*, 188 W. Va. 105, 116, 422 S.E.2d 827 (1992) ("[w]hether a child is a mature minor is a question of fact"). Accordingly, Judge Quinn's finding that she was not mature is subject to review for clear error. *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, 273 Conn. 296, 309, 869 A.2d 1198 (2005). Whether the respondents' constitutional due process rights were violated is a question of law over which our review is plenary. *Commissioner of Environmental Protection* v. *Farricielli*, 307 Conn. 787, 819, 59 A.3d 789 (2013) ("[w]hether [a party] was deprived of his due process rights is a question of law, to which we grant plenary review" [internal quotation marks omitted]).

We next review the governing legal principles. This court previously has not had the opportunity to address directly the question of whether and, if so, under what circumstances minors may be competent to make their own medical decisions. The United States Supreme Court has recognized, however, that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham* v. *J. R.*, 442 U.S. 584, 603, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979). Accordingly, "[a]t common law, minors generally were considered to lack the legal capacity to give valid consent to medical treatment or services, and consequently a parent, guardian, or other legally authorized person generally was required to provide the requisite consent. In the absence of an emergency, a physician who provided medical care to a minor without such parental or other legally authorized consent could be sued for battery." *American Academy of Pediatrics* v. *Lungren*,

16 Cal. 4th 307, 314–15, 940 P.2d 797, 66 Cal. Rptr. 210 (1997); see also id., 315 ("[t]he requirement that medical care be provided to a minor only with the consent of the minor's parent or guardian remains the general rule, both in California and throughout the United States").

Although this general common-law principle has not been expressly recognized by this court, it has been implicitly recognized by our legislature. For example, pursuant to General Statutes § 46b-150d, "a minor[10] [who] is *emancipated* . . . (1) . . . may consent to medical, dental or psychiatric care, without parental consent, knowledge or liability . . . ." (Emphasis added; footnote added.) Thus, under the "tenet of statutory construction referred to as expressio unius est exclusio alterius, which may be translated as the expression of one thing is the exclusion of another"; (internal quotation marks omitted) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 851, 937 A.2d 39 (2008); it is implicit that unemancipated minors do not have this ability. Similarly, other statutes providing that under specific, narrowly limited circumstances, minors may make medical decisions clearly imply legislative recognition of the common-law principle that they generally are not competent to do so.[11] We conclude, therefore, that the general rule in this state is that minors are presumed to be incompetent to make medical decisions.[12] A number of courts have concluded, however, that there is an exception to this general common-law principle for *mature* minors. See *In re E.G.*, 133 Ill. 2d 98, 111, 549 N.E.2d 322 (1989) ("[i]f the evidence is clear and convincing that the minor is mature enough to appreciate the consequences of her actions, and that the minor is mature enough to exercise the judgment of an adult, then the mature minor doctrine affords her the common law right to consent to or refuse medical treatment"); *In re Swan*, 569 A.2d 1202, 1205 (Me. 1990) (minor has capacity to consent to withholding of medical treatment when "the minor has the ability of the average person to understand and weigh the risks and benefits" and "if he is capable of appreciating the nature, extent, and probable consequences of the conduct consented to" [internal quotation marks omitted]); *Cardwell* v. *Bechtol*, 724 S.W.2d 739, 748 (Tenn. 1987) ("Whether a minor has the capacity to consent to medical treatment depends upon the age, ability, experience, education, training, and degree of maturity or judgment obtained by the minor, as well as upon the conduct and demeanor of the minor at the time of the incident involved. Moreover, the totality of the circumstances, the nature of the treatment and its risks or probable consequences, and the minor's ability to appreciate the risks and consequences are to be considered."); *Belcher* v. *Charleston Area Medical Center*, supra, 188 W. Va. 116 ("[W]e hold that, except in very extreme cases, a physician has no legal right to perform a procedure

upon, or administer or withhold treatment from a . . . child without the consent of the child's parents or guardian, unless the child is a mature minor, in which case the child's consent would be required. Whether a child is a mature minor is a question of fact. Whether the child has the capacity to consent depends upon the age, ability, experience, education, training, and degree of maturity or judgment obtained by the child, as well as upon the conduct and demeanor of the child at the time of the procedure or treatment. The factual determination would also involve whether the minor has the capacity to appreciate the nature, risks, and consequences of the medical procedure to be performed, or the treatment to be administered or withheld."); see also *In the Matter of Rena*, 46 Mass. App. 335, 337, 705 N.E.2d 1155 (1999) (court may "consider the maturity of the child to make an informed choice" when determining whether refusal of medical treatment is in child's best interest).

With these principles in mind, we turn to the respondents' claims in the present case that Judge Quinn could not have determined that Cassandra was not a mature minor because that issue was not before her at the December 9, 2014 hearing and, even if the issue was before Judge Quinn, her finding that Cassandra was not a mature minor was not supported by the evidence. We disagree. For purposes of the mature minor doctrine, a mature minor is a minor who is competent to make medical decisions. As we have explained, the very reason that the commissioner asked for the December 9, 2014 hearing was to determine Cassandra's competence to refuse chemotherapy treatment for her cancer. Accordingly, the issue of whether Cassandra was sufficiently mature to make this decision despite the fact that she was a minor was squarely before the court. Under the authority previously set forth, there is a legal presumption that Cassandra was not competent to make the life or death decision whether to undergo chemotherapy treatment for her cancer because she was a minor, and the burden was therefore on the respondents to establish that she was sufficiently mature to do so. Because the respondents failed to produce any evidence on that factual issue, despite being on notice that that was the purpose of the hearing, there was no basis for Judge Quinn to find that Cassandra was a mature minor under any standard.[13] Accordingly, we conclude that her finding that Cassandra was not competent to make her own medical decisions was not clearly erroneous.

Moreover, although the burden was not on the department to show that Cassandra was *not* a mature minor, there was ample evidence to support Judge Quinn's express factual findings that Cassandra was not yet fully separated from or independent of her mother, that she was prone to engage in compulsive and risky actions, that she was unable or unwilling to speak her

true mind to those in authority, and that she was reluctant to hold opinions that her mother did not share. Specifically, there was evidence: that Cassandra was extremely nervous and timid during the hearing before Judge Taylor, and that she was fearful during the medical evaluation at the medical center emergency room that followed the hearing; that the reasons that Cassandra did not want to undergo chemotherapy were that she was afraid of seeing "tubes sticking out of her" and that she did not yet feel sick, even though she had been told repeatedly that she would die without the treatment and that delaying treatment until she felt sick could have very serious consequences, potentially including her death; that Cassandra was very emotionally dependent on her mother, and was heavily influenced by her mother's distrust of physicians and other persons in positions of authority; that the respondents were influenced by their independent research into Hodgkin's lymphoma and its medical treatments, even after numerous physicians contradicted that research;[14] that Cassandra had intentionally misrepresented her intentions to Judge Taylor and the department when she stated that she was willing to undergo treatment; and that Cassandra intentionally violated Judge Taylor's order and placed her own health at serious risk when she interrupted chemotherapy and ran away from home. In turn, Judge Quinn's factual findings amply support her ultimate determination that Cassandra was not a mature seventeen year old and, therefore, was not competent to make her own medical decisions.

The respondents claim, however, that Judge Quinn improperly relied on Isakoff's testimony that Cassandra was not competent to make the decision rejecting treatment because that testimony was based on the "impossible position that an individual is proved incompetent to refuse medical care simply by the fact that she refuses medical care." The respondents concede that "[t]here is no dispute that Cassandra's refusal of treatment, if permitted, would be deleterious to her health," and they have pointed to no possible benefit that would have been gained if she had been permitted to refuse or delay treatment. Thus, they are effectively claiming that Cassandra had a right to reject lifesaving medical treatment for any reason or for no reason, and her assertion of this right had no bearing on the question of whether she was a mature minor. We disagree. Even if we were to assume that adults have the unfettered right to refuse lifesaving medical treatment, an issue that we need not address here, the law is clear that a seventeen year old does not have that right but, to the contrary, is presumed to be incompetent to do so, at least in the absence of proof of maturity. We conclude that it was well within Judge Quinn's discretion to credit Isakoff's eminently sensible opinion that Cassandra's assertion of her purported "right" to refuse the only treatment that could save her life for no reason except that it was her right

to do so, did not constitute evidence of maturity, but its opposite.[15] Accordingly, we conclude that the record amply supports Judge Quinn's ultimate finding that Cassandra was not a mature seventeen year old, and, therefore, was not competent to refuse a course of medical treatment that would provide her with her only chance of survival.[16] Thus, there is no need for us to reach the question of whether we should adopt the mature minor doctrine because, even if we were inclined to do so, the doctrine would not apply to Cassandra.

We further conclude that the respondent's constitutional rights were not violated. Even if we were to assume that the mature minor doctrine applies, because the respondents were on notice that the purpose of the December 9, 2014 hearing before Judge Quinn was to determine Cassandra's competence to refuse lifesaving medical treatment and they had an opportunity to present evidence on that question, they have failed to establish the factual predicate of their claim that they were deprived of their constitutional due process rights to a hearing at which they could establish that Cassandra was a mature minor before she could be removed from the care and custody of her mother and subjected to forced medical treatment.[17] Although the respondents contend that the December 9, 2014 hearing did not comply with constitutional due process requirements because there was no expert testimony regarding Cassandra's decision-making capacity, the burden was on them to prove that Cassandra was competent. They make no claim that they were prohibited from presenting such evidence.[18] Accordingly, even if we were to assume that the respondents had a constitutional right to present expert testimony, they were not deprived of that right.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 8, 2015, the date that the order was issued in this case, is the operative date for all substantive and procedural purposes.

[1] For purposes of convenience, references herein to both the mother and Cassandra jointly are to the respondents.

[2] The respondents appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Matthew Richardson, a pediatric oncologist from whom the respondents subsequently sought a second opinion, explained in a report that if treatment is delayed, the cancer can spread to other lymph nodes and other parts of the body. As the affected lymph nodes continue to grow, they can compress vital structures such as veins and airways, which can be fatal. In addition, the larger the affected lymph nodes are when chemotherapy starts, the greater is the risk of a condition known as tumor lysis syndrome, which can result in heart arrhythmias and kidney failure.

[4] A "port-a-cath" is "[a] central venous catheter . . . that goes into a vein in [the patient's] chest . . . ." United States National Library of Medicine, "MedlinePlus, Central Venous Catheters—Ports," available at http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000491.htm (last

visited April 10, 2015).

[5] "The Silver Alert system . . . [is] an emergency notification system for law enforcement agencies to broadcast local, regional, or statewide public alerts via radio, television and electronic highway signs. The Silver Alert system mandates that law enforcement immediately begin searching for missing individuals who are ages [sixty-five] or older, or ages [eighteen] and over if mentally impaired. Once the police receive a missing person's report and a description of the missing person, the information is broadcast via radio, television, and electronic highway signs through the Emergency Alert System . . . . The plan alerts the public as quickly as possible to the disappearance so everyone may assist in the search for the safe return of the individual." State of Connecticut, Department on Aging, "Connecticut Silver Alert System—An Elderly And Or Mental Impairment Locator System," (last modified on December 5, 2011), available at http://www.ct.gov/agingservices/cwp/view.asp?Q=442724&A=2513 (last visited April 10, 2015).

[6] A transcript of the November 12, 2014 hearing was introduced as an exhibit at the December 9, 2014 hearing before Judge Quinn. Although the exhibits that had been introduced at the November 12 hearing were not introduced as exhibits at the December 9 hearing, they were part of the court file that was before Judge Quinn.

[7] We also granted permission to the American Civil Liberties Union Foundation of Connecticut to file an amicus curiae brief in support of the respondents' position.

[8] The respondents filed a motion for review of Judge Quinn's articulation, claiming that the issue of whether Cassandra is a mature minor had not been raised at the hearing before Judge Quinn. They claimed that the articulation should be disregarded. This court granted the motion but denied the requested relief.

[9] The respondents point out that they did not expressly rely on the mature minor doctrine at the December 9, 2014 hearing before Judge Quinn and that their constitutional claims are also unpreserved. Accordingly, they seek review of their claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the respondents were on notice that the issue of Cassandra's competence to make medical decisions would be addressed at the evidentiary hearing before Judge Quinn, we conclude that the issue of whether Cassandra was sufficiently mature to make medical decisions was not unpreserved. Rather, the respondents failed to present evidence on the issue. Because the respondents had a hearing on the issue, there is, as we discuss more fully later in this opinion, no basis for their constitutional claims.

[10] "Except as otherwise provided by statute, on and after October 1, 1972, the terms 'minor', 'infant' and 'infancy' shall be deemed to refer to a person under the age of eighteen years and any person eighteen years of age or over shall be an adult for all purposes whatsoever and have the same legal capacity, rights, powers, privileges, duties, liabilities and responsibilities as persons heretofore had at twenty-one years of age, and 'age of majority' shall be deemed to be eighteen years." General Statutes § 1-1d.

[11] See General Statutes § 17a-688 (d) (minor may consent to treatment for drug and alcohol addiction); General Statutes § 19a-216 (a) (minor may obtain treatment for venereal disease without parental consent); General Statutes § 19a-285 (a) (minor may consent to medical treatment of minor's child); General Statutes § 19a-592 (a) (minor may be treated for human immunodeficiency virus infection without parental consent if notification of parent will result in treatment being denied or if minor will refuse treatment if parents are notified); General Statutes § 19a-601 (minor may have abortion without parental consent).

[12] We emphasize that we merely conclude that, by enacting statutes providing that minors may consent to medical treatment only in certain limited circumstances, the legislature has implicitly recognized the common-law rule that minors are presumed to be incompetent to make medical decisions. We leave for another day the question of whether the legislature intended that this would be a *conclusive* presumption in the absence of a statutory exception and, therefore, the courts are precluded from allowing minors to rebut the presumption under the mature minor doctrine. Accordingly, we need not address the amicus' argument that, because many statutes treat sixteen and seventeen years olds in the same manner as adults, minors of that age are entitled to a hearing on the question of whether they are sufficiently mature to make medical decisions.

[13] Cassandra testified at the November 12, 2014 hearing that she has worked since she was fourteen years old and pays some of her own bills.

This evidence has little bearing on her competence to make life and death medical decisions on her own. In addition, Cassandra's mother testified at the December 9, 2014 hearing that Cassandra was a "very bright, intelligent girl" who "can make her own decisions." This conclusory statement also provides little support for the respondents' position. Although Cassandra may be intelligent, intelligence, in and of itself, is not evidence of maturity, and she provided no reasoned argument for refusing chemotherapy treatment.

[14] The mother's testimony that Cassandra did not want to put "poisons" in her body that could affect her for the rest of her life did not justify Cassandra's decision in any rational way. There was ample evidence that Cassandra would die within a relatively short period of time if she did not receive chemotherapy and that there was a high probability of cure if she received treatment. Even if the chemotherapy will have some long-term side effects, there was *no* evidence presented that there is a significant risk that those side effects will be worse than certain death in the near future.

[15] We emphasize that we do not suggest that the refusal of lifesaving medical treatment is unreasonable, per se. Such a decision may well be justified by, for example, deeply held religious convictions, advanced age, a small chance of long-term survival or the significant likelihood of a poor quality of life. The respondents in the present case, however, have presented *no* plausible justification for Cassandra's refusal to be treated. They have merely made the bare assertion that it is her "right" to refuse treatment, for any reason or for no reason.

The respondents suggest that Isakoff was not competent to evaluate whether Cassandra was sufficiently mature to make her own medical decisions because he was not a psychiatrist or psychologist. We disagree. Isakoff is a board certified pediatrician and has worked for more than nine years at the medical center, which specializes in treating children. In addition, he has taken courses in psychology and has had psychological training in helping families and patients to cope with a serious diagnosis. Even if we were to assume that the question of whether a minor is sufficiently mature to make medical decisions is a question that requires some specialized knowledge, and is not within the knowledge and experience of an ordinary person—a question that we do not decide here—we conclude that the issue is within the knowledge of an experienced pediatrician with psychological training who has treated the particular minor in question. See *Belcher* v. *Charleston Area Medical Center*, supra, 188 W. Va. 115 (treating physician must exercise best medical judgment as to whether minor patient is sufficiently mature to be able to consent to treatment).

[16] We cast no aspersions on Cassandra. It is perfectly understandable that a seventeen year old who is confronted with a devastating medical diagnosis would be confused and anxious, would depend heavily on a parent for guidance and emotional support, would have some fear and distrust of medical providers, and would go through a period of denial. These natural emotions, however, do not evince maturity. Indeed, the fact that children and adolescents are more prone to such emotions than adults and more easily swayed by them when making important decisions is the very reason for the common-law rule that minors generally are not competent to make medical decisions.

[17] The respondents characterized Cassandra's right not to be subjected to unwanted medical treatment and their right to family integrity as substantive due process rights in their brief to this court. At oral argument, however, the mother conceded that the respondents are raising a procedural due process claim that they were entitled to a hearing on the question of whether Cassandra was a mature minor.

[18] The respondents contend that Cassandra did not know that she was entitled to present expert testimony on the issue of her competence to make medical decisions at the December 9, 2014 hearing because this court has not yet adopted the mature minor doctrine. The mere fact that this court has not yet adopted the doctrine, however, would not have prevented Judge Quinn from applying it for the first time if she had been asked to do so, had determined that the doctrine is consistent with the public policy of this state and had found Cassandra to be a mature minor.